UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

NELSON A. ALVAREZ,
                    *Plaintiff*,

          v.                                                Case No. 1:21-cv-00433-MSN-TCB

KILOLO KIJAKAZI, Commissioner of
Social Security,[1]
                    *Defendant*.

## MEMORANDUM OPINION & ORDER

This matter comes before the Court on the parties' cross-motions for summary judgment
(Dkt. Nos. 16, 19). Plaintiff Nelson A. seeks judicial review of the final decision of defendant
Kilolo Kijakazi, Commissioner of the Social Security Administration, finding that he is no longer
disabled under section 223(f) of the Social Security Act, 42 U.S.C. § 423 (the "Act"). For the
reasons stated below, the Court will DENY plaintiff's Motion for Summary Judgment (Dkt. No.
16), GRANT defendant's Motion for Summary Judgment (Dkt. No. 19), and AFFIRM the ALJ's
decision.[2]

## I.      Background

Effective December 23, 2016, the Social Security Administration ("SSA") found plaintiff
disabled. AR at 35. The SSA again found plaintiff disabled on April 3, 2017. *Id.* at 88. But on July

---

[1] Kilolo Kijakazi is the Acting Commissioner of Social Security and is automatically substituted as a party pursuant
to Fed. R. Civ. P. 25(d). See also section 205(g) of the Social Security Act, 42 U.S.C § 405(g) (action survives
regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and
7(C). *See* Dkt. No. 11.  In accordance with those rules, this order excludes any personal identifiers such as plaintiff's
full name, social security number and date of birth (except for the year of birth), and the discussion of plaintiff's
medical information is limited to the extent necessary to analyze the case.

16, 2018, the SSA found that plaintiff's disability had ceased. *Id.* On January 8, 2019, an SSA hearing officer upheld that decision on reconsideration, and plaintiff appealed. *Id.* at 117.

On February 14, 2020, plaintiff appeared before Administrative Law Judge ("ALJ") Andrew Emerson for an in-person hearing to challenge the SSA's determination that he no longer was disabled. *Id.* at 54. Plaintiff, represented by an attorney and with the assistance of a Spanish interpreter, testified at that hearing, as did a Vocational Expert ("VE"). *Id.* On March 25, 2020, the ALJ issued a decision finding that plaintiff was no longer disabled under the Act, even though he suffered from the following severe medically determinable impairments: ventral incisional hernia, skin grafts to abdomen, and diabetes. *Id.* at 37, 45. The Appeals Council found no basis to review and affirmed the ALJ's decision. *Id.* at 1.

Having exhausted his administrative remedies, plaintiff filed a *pro se* Complaint with this Court on April 7, 2021, challenging the ALJ's decision. (Dkt. No. 1). Plaintiff filed a Motion for Summary Judgment (Dkt. No. 16) on March 18, 2022, including a Memorandum in Support of Plaintiff's Motion for Summary Judgment (Dkt. No. 17). Defendant filed a Cross-Motion for Summary Judgment (Dkt. No. 19) on April 18, 2022, along with a Memorandum in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. Nos. 20, 21). Accordingly, the parties' motions are ripe for disposition.

## II.     Evidence before the ALJ

Below is a summary of plaintiff's testimony before the ALJ and other medical evidence of plaintiff's impairments.

### A.     Testimony at the Administrative Hearing

At the hearing on February 14, 2020, plaintiff, represented by an attorney and with the assistance of a Spanish interpreter, appeared before the ALJ. AR at 39. Plaintiff was forty-three

years old, 5'1" tall,[3] and weighed 170 pounds. *Id.* at 58. He lived at home with his wife and four

children. *Id.* at 62. He previously was employed as a Construction Worker I—a semiskilled job

with a very heavy exertional level as actually performed. *Id.* at 73.

In terms of a typical day in his life, plaintiff described being able to walk for two blocks or

the length of a basketball court without getting pain in his stomach and needing to stop. *Id.* at 59.

But when stomach pain did arise, plaintiff registered it at an eight or nine on a ten-point scale. *Id.*

at 64. Plaintiff also testified that he was capable of lifting fifteen pounds and that he experienced

some pain relief in his stomach when wearing an abdominal binder. *Id.* at 60–61. Plaintiff,

however, stated he did not receive significant pain relief from "three different kinds of pills" he

was prescribed to help him use the bathroom. *Id.* at 61. Plaintiff elaborated on this point by

explaining it generally took him between twenty-five and forty-five minutes to use the bathroom,

and that he had to "go constantly" on account of his medical impairment(s). *Id.* at 70. Plaintiff also

described having difficulty sleeping because of the anxiety and depression he felt when thinking

about his condition. *Id.* at 71. Plaintiff stated he received medication for those feelings and also

took insulin for his diabetes three times per day. *Id.* at 71–72.

In testimony from the VE, it was established that plaintiff's prior work experience was in

a semiskilled position that required heavy exertion as generally performed and very heavy exertion

as actually performed. *Id.* at 73. The ALJ then described the following hypothetical person for the

VE to consider: The hypothetical person had plaintiff's same vocational profile in terms of age,

education, and work experience and was limited to a light exertion level, with the additional

limitations that the individual could only occasionally climb ramps and stairs, balance, stoop,

kneel, crouch, or crawl; could never climb ladders, ropes, or scaffolds; and would need to avoid

---

[3] The Court notes that the record elsewhere identifies plaintiff as standing 5'8" tall. *See* AR at 80.

concentrated exposure to extreme cold, extreme heat, wetness, excessive vibration, hazardous moving machinery, and unprotected heights. *Id.*

The VE testified that the following positions existed in the national economy that satisfied the limitations set forth by the ALJ: garment sorter (23,000 jobs), folder (35,000 jobs), and classifier (55,000 jobs). *Id.* at 74. And the VE made clear that the ability to perform those jobs did not turn on whether the individual could speak English. *Id.*

The ALJ then modified the limitations placed on the hypothetical person, such that the individual could perform only sedentary work with the same postural and environmental limitations included in the first hypothetical question. *Id.* at 75. The VE testified that the following positions existed in the national economy for individuals restricted by that additional limitation: sorter (28,000 positions), assembler (23,000 positions), and stuffer (19,000) positions. *Id.* at 75–76. But, the VE continued, there would be no such jobs in the economy if the hypothetical individual very frequently had to rest for forty-five minutes and use the restroom for forty-five minutes at a time. *Id.* at 77.

### B.   Record Evidence

The medical evidence documents plaintiff's history of seeking treatment for his concurrent impairments both before and after his cessation date, as determined by the SSA.

<u>Prior to Cessation Date</u>

On January 4, 2017, plaintiff presented to Inova Fairfax Hospital with complaints of epigastric abdominal pain and a history of ethyl alcohol abuse. *Id.* at 5041. He weighed 185 pounds. *Id.* Dr. Julie Daniele Gribetz diagnosed plaintiff with active pancreatitis "in the setting of binge drinking." *Id.* at 5044. Plaintiff then was admitted to the hospital for several months, during which time he was intubated and underwent numerous medical procedures including a

"decompressive laparotomy, multiple washouts, and multiple drains." *Id.* at 6367. During that stay, plaintiff was treated by Drs. Jill Watras, Edmond K. Ng, Christopher Michetti, and Elizabeth Franco Cadavid, among others. *See id.* at 385–749.

On February 14, 2017, while still hospitalized, plaintiff filed for disability due to a heart attack and pancreas pain with an alleged onset date of December 24, 2016. *See id.* at 80–81.

On April 3, 2017, the SSA found that plaintiff's claim for disability was supported, with an "[e]arliest potential onset date" of December 23, 2016. *Id.* at 83. In reciting her findings of fact and analysis of evidence, the disability adjudicator stated that plaintiff was hospitalized beginning on January 4, 2017, "due to alcohol induced pancreatitis." *Id.* at 83. She continued that plaintiff was "noted to weigh[]" 262 pounds on January 12, 2017 and only 199 pounds on February 14, 2017.[4] *Id.* By the time of the SSA's decision, plaintiff reported his weight at 120 pounds, with a corresponding Body Mass Index ("BMI") of 18.2. *Id.* at 80. The disability adjudicator determined plaintiff "appear[ed] capable of less than a full range of sedentary work" insofar as he "appear[ed] capable of standing/walking about 1 hour total in an 8 hour work day." *Id.* at 83. She based that conclusion on plaintiff's "significant conditions, complications, and weight loss." *Id.* Specifically, the disability adjudicator found plaintiff suffered from the following medically determinable impairments: Other Disorders of Gastrointestinal System and Weight Loss. *Id.* at 83–84. Dr. James Darden provided a residual functional capacity ("RFC") that supported the disability adjudicator's findings. *Id.* at 84–86. In it, he opined that plaintiff could stand and/or walk for "[s]ignificantly less than 2 hours" and could lift only ten pounds "frequently" or "occasionally." *Id.* at 85. Dr.

---

[4] The Court questions this observation based on the fact that plaintiff's stated weight at the time of his January 4, 2017 admission to the hospital was 83.915 kg (or 185 pounds). AR at 5041. Plaintiff's "[s]elf [r]eported [w]eight" at the time he filed for disability was 120 pounds. *See id*. at 80. Thus, the amount of weight lost during the relevant period remained approximately sixty-five pounds, irrespective of the potential inaccuracy contained in the disability adjudicator's statement regarding plaintiff's weight on January 12 and February 14, 2017.

Darden continued that his RFC reflected the "significant medical conditions, multiple abdominal surgeries with continued infection, complications, extended hospital stay, and significant weight loss" plaintiff was experiencing. *Id.*

On April 17, 2017, plaintiff was released from the hospital. *Id.* at 6389. His discharge instructions read: "No heavy lifting or strenuous activity until cleared by [a] surgeon." *Id.* at 6390.

On April 21, 24, and 27, 2017, plaintiff returned to Inova Fairfax Hospital. *Id.* at 5023, 5027, 5032. During those visits, plaintiff reported "eating better and moving better at home." *Id.* at 5023.

On May 5, 2017, Dr. Mario P. Zambito treated plaintiff regarding his post-operative concerns and conducted a "wound check." *Id.* at 5018. Dr. Zambito observed that plaintiff's stomach "wound look[ed] great." *Id.* at 5022.

On May 18, 2017, plaintiff received a split-thickness skin graft to address his "chronic abdominal wound secondary to open abdomen for pancreatitis." *Id.* at 5000–10. He weighed 113 pounds. *Id.* at 5002. Five days later, on May 23, 2017, Dr. Franco Cadavid treated plaintiff's split-thickness skin graft. *Id.* at 4999. Plaintiff weighed 116 pounds. *Id.*

On June 6, 2017, plaintiff arrived at the Inova Fairfax Hospital after a drain related to his stomach wound became partially dislodged. *Id.* at 4992, 4996. While there, he reported that he was "eating well" and was not having "any bothersome symptoms." *Id.* at 4996.

On June 9, 2017, plaintiff visited Dr. Carly Allred regarding the stomach wound he had, as related to the procedures performed during his "prolonged hospitalization for acute pancreatitis." *Id.* at 4894. Dr. Allred noted that plaintiff "ha[d] been eating well and gained 4 pounds since his last visit." *Id.*

On June 23, 2017, plaintiff returned to Dr. Allred for a follow-up appointment. *Id.* at 4980. There, plaintiff "report[ed] doing well at home" and "[e]ating more." *Id.* Dr. Allred observed that plaintiff was "[s]till thin, but gaining weight." *Id.*

On July 6, 2017, Luciana Lawrence, Registered Nurse, saw plaintiff for a drain check/removal regarding his stomach wound. *Id.* at 4974. The next day, Dr. Erik Teicher treated plaintiff for the same reason, *i.e.*, for a "follow up and drain check" after a "prolonged hospitalization for acute pancreatitis." *Id.* at 4971. Dr. Teicher noted that plaintiff felt "he continue[d] to get better, and [wa]s tolerating more and more food." *Id.*

On July 14, 2017, Dr. Hani Seoudi examined plaintiff and noted that plaintiff "[d]enied abdominal pain" and was "tolerating [a] regular diet and [was] having regular bowel movements." *Id.* at 4969–71. Dr. Seoudi also observed that plaintiff's "[s]kin graft [wa]s 100% take but still c[ould n]ot be fully lifted off [of the] underlying skin." *Id.* at 4971. Dr. Seoudi directed plaintiff to "[f]ollow up in one month to evaluate for ventral hernia repair." *Id.*

Between July 28 and August 1, 2017, plaintiff was hospitalized with tachypnea and hyperglycemia. *See id.* at 4921–4968. He weighed 120 pounds and reported he did "not have any abdominal pain like his previous pancreatitis." *Id.* at 4922, 4925. By the time of discharge, plaintiff was "at/near functional baseline with mobility, strength, balance and stairs" and said he was "feeling much better." *Id.* at 4963.

On August 4, 2017, plaintiff sought treatment for his diabetes from Dr. Keilla A Schmidt. *Id.* at 4917. Dr. Schmidt recounted that plaintiff had been "recently admitted with hyperglycemia" but "was discharged and [wa]s doing well." *Id.* Dr. Schmidt advised plaintiff to control his glucose levels, follow up with an endocrinologist, and "eat a balanced diet" such that he could "gain weight to optimize nutrition for hernia repair in [the] future." *Id.* at 4920.

On August 7, 2017, plaintiff had an initial visit with Meghan Anne Schultz, Family Nurse Practitioner, regarding his diabetes. *Id.* at 4914. He weighed 123 pounds. *Id.* at 4915.

On August 14, 2017, Carmen de La Rosa, Nurse Practitioner, treated plaintiff for his diabetes which was "under inadequate control." *Id.* at 4910, 4913. He weighed 129 pounds. *Id.* at 4912.

On August 15, 2017, plaintiff returned to Ms. Schultz for diabetes treatment. *Id.* at 4907. He weighed 129 pounds. *Id.* at 4908. Ms. Schultz observed that plaintiff was "medically stable and [wa]s being seen by specialists regularly." *Id.* at 4909.

On August 28, 2017, plaintiff returned to Ms. de La Rosa. *Id.* at 4902. She noted that plaintiff's weight of 135 pounds was "increasing steadily" and that his "[c]urrent symptoms/problems includ[ing] hyperglycemia and chronic abdominal wound infections/delayed healing . . . ha[d] been improving." *Id.* at 4902. Ms. de La Rosa also noted that plaintiff's diabetes was "under better control." *Id.* at 4906.

On September 8, 2017, plaintiff was seen by Dr. Seoudi. *Id.* at 4899. Dr. Seoudi observed that plaintiff had not experienced "unexpected weight change" and was "doing well" and "denie[d] pain" despite his "ventral hernia with retracted abdomen wall muscles." *Id.* at 4901.

On October 2, 2017, Ms. de La Rosa treated plaintiff. *Id.* at 4895. She observed that plaintiff's symptoms "ha[d] been improving" even though his "Diabetes Mellitus type II" was "under poor control[]." *Id.* at 4895, 4898. Ms. de La Rosa also observed that plaintiff was last seen on August 28, 2017 and that he "was doing better, more active, tolerating more physical activity" and that his "chronic abdominal wound [was] improving." *Id.* at 4895.

On October 27, 2017, plaintiff reported to Dr. Courtney Grant for a follow up appointment regarding his past treatment for necrotizing pancreatitis. *Id.* at 4892. Dr. Grant observed that

plaintiff "ha[d] been doing well" although "he did notice some drainage from the site" of his abdominal surgeries. *Id.*

On October 30, 2017, plaintiff returned to Ms. de La Rosa. *Id.* at 4887. Ms. de La Rosa observed that plaintiff was "tolerating more physical activity" and that his "chronic abdominal wound [was] improving." *Id.* at 4888. Ms. de La Rosa also stated that plaintiff weighed 147 pounds, "look[ed] good," and that his symptoms, which had been "present for several months," were "improving." *Id.* at 4888, 4890. Additionally, Ms. de La Rosa commented that plaintiff was last seen on October 2, 2017 and "was doing better, more active, tolerating more physical activity, [and that his] chronic abdominal wound [was] improving." *Id.*

On November 21, 2017, plaintiff was seen by Dr. Watras—one of the doctors who had treated plaintiff during his prolonged hospital stay earlier that year. *Id.* at 4887. During that visit, Dr. Watras recorded plaintiff's weight at 153 pounds. *Id.* She also stated that plaintiff had presented for a "wound check" and was "known to [her] service [for] having had necrotizing pancreatitis requiring multiple abdominal washouts and a skin graft." *Id.* Dr. Watras observed "minimal" drainage from plaintiff's wound and directed plaintiff to "follow up in 3 months for evaluation of his abdominal wall and to schedule abdominal wall reconstruction." *Id.* Later medical records that list pancreatitis as one of plaintiff's "[p]roblem[s]" show that it was first noted on January 4, 2017 but was "[r]esolved" by Dr. Watras on November 21, 2017. *See, e.g.*, *id.* at 6833, 6986.

On December 26, 2017, plaintiff again visited Ms. de La Rosa. *Id.* at 4883. In recounting plaintiff's medical history, Ms. de La Rosa noted that plaintiff had been diagnosed with diabetes in January 2017 and was hospitalized with tachypnea and hyperglycemia between July 28 and August 1, 2017. *Id.* at 4883. Ms. de La Rosa further observed that plaintiff had gained nine pounds "in the last month and another [six pounds] from the previous months." *Id.* Ms. de La Rosa also

recorded that plaintiff's symptoms of "hyperglycemia and chronic abdominal wound infections/delayed healing . . . ha[d] been improving." *Id.* Ms. de La Rosa concluded that plaintiff suffered from "Diabetes Mellitus type II, with inadequate control." *Id.* at 4886.

On December 27, 2017, plaintiff reported to the emergency department at Inova Fairfax Hospital with complaints of abdominal pain. *See id.* at 4863–83. He was diagnosed with a partial small bowel obstruction. *Id.* Plaintiff stated his pain did "not feel like his prior pancreatitis flare-ups" and the treating doctor found that pain "improved with [the] treatment offered in the emergency department." *Id.* at 4879.

On January 12, 2018, plaintiff again visited Dr. Ng and stated he was "[n]o[t] working due to [his] hernia." *Id.* at 4860. Dr. Ng assessed plaintiff as suffering from a "giant hernia with visible bowel peristalsis" and directed plaintiff to "avoid heavy lifting." *Id.* at 4862–63.

On March 12, 2018, plaintiff returned to Ms. de La Rosa regarding his "Type 2 diabetes mellitus." *Id.* at 4854. Ms. de La Rosa noted plaintiff's medical history was "significant for [ ] necrotizing pancreatitis with retroperitoneal abscess" and that in January of 2017, plaintiff had been "found to be in DKA"[5] when admitted to the hospital for his pancreatitis. *Id.* at 4854–55. Ms. de La Rosa determined plaintiff's diabetes was "under inadequate control" and urged plaintiff to follow a "consistent carbohydrate diet." *Id.* at 4858. In response, Ms. de La Rosa adjusted plaintiff's medication dosages. *Id.*

On April 18, 2018, plaintiff again visited Dr. Ng and stated he was "unable to work due to discomfort of hernia." *Id.* at 4852. Dr. Ng found plaintiff was "[p]ositive for abdominal distention and abdominal pain" and directed plaintiff to "obtain [a] CT and [then] return to [his] office." *Id.* at 4853–54.

---

[5] Diabetic ketoacidosis.

On May 18, 2018, plaintiff returned to Dr. Franco Cadavid regarding his "incisional hernia following open abdomen for abdominal compartment syndrome as result of acute necrotizing pancreatitis [in] Jan[uary] 2017." *Id.* at 4849. During that visit, Dr. Franco Cadavid commented that, since 2017, plaintiff had "been steadily improving with improved nutritional status and functional status." *Id.* Dr. Franco Cadavid also recorded plaintiff's weight at 159 pounds and noted that plaintiff was "[n]egative for abdominal pain." *Id.* at 4850. Dr. Franco Cadavid assessed plaintiff with diabetes mellitus, idiopathic acute pancreatitis without infection or necrosis, and incisional hernia without obstruction or gangrene. *Id.* at 4851.

On June 4, 2018, plaintiff returned to Ms. de La Rosa regarding his "Type 2 diabetes mellitus." *Id.* at 4844. He weighed 158 pounds. *Id.* 4845. Ms. de La Rosa determined plaintiff's diabetes was "under inadequate control" and urged plaintiff to "improve consistent carbohydrate diet." *Id.* at 4848. In response, Ms. de La Rosa adjusted plaintiff's medication dosages. *Id.*

On July 9, 2018, plaintiff returned to Ms. de La Rosa, for a follow-up appointment regarding his "Type 2 diabetes mellitus." *Id.* at 6689. Ms. de La Rosa observed that plaintiff's diabetes symptoms had "been worsening" but that plaintiff's weight was "stable" and he was exercising by "walking." *Id.*

From Cessation Date Forward

On July 16, 2018, the SSA reevaluated plaintiff for disability and found that plaintiff's disability had ceased. *Id.* at 90–99. In support, the disability adjudicator observed that plaintiff's weight had dropped to 129 pounds in August of 2017 but had increased to 158 pounds in June of 2018 (with a corresponding BMI of 25.50). *Id.* at 93. The disability adjudicator further observed that plaintiff had "been able to gain weight and keep the weight" and "had no ongoing procedures since abstaining from alcohol use." *Id.* at 95. State Agency consultant Dr. Donald Williams then

completed a Physical Residual Functional Capacity Assessment through which he opined that plaintiff occasionally could lift twenty pounds and frequently could lift ten pounds; could sit for about six hours in an eight-hour workday, as well as stand and/or walk for about the same amount of time; and could occasionally climb, balance, stoop, kneel, crouch, and/or crawl. *Id.* at 95–96. As such, Dr. Williams concluded that plaintiff was capable of performing light work. *Id.* at 97.

On August 13, 2018, plaintiff returned to Ms. de La Rosa. *Id.* at 6696. Her assessment of plaintiff remained unchanged, insofar as she found that plaintiff's diabetes was "under inadequate control." *Id.* at 6701.

On September 4, 2018, state agency consultant Dr. Cheryl Arenella completed a Physical Residual Functional Capacity Assessment of plaintiff. *Id.* at 6705–6713. There, she found plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. *Id.* at 6706. She also concluded that plaintiff could stand and/or walk for about six hours in an eight-hour workday and could sit for the same amount of time. *Id.* As for plaintiff's postural limitations, Dr. Arenella opined that plaintiff could occasionally climb, stoop, kneel, crouch, and crawl, and could frequently balance. *Id.* at 6707. Dr. Arenella also indicated that she did not believe plaintiff would require any environmental limitations. *Id.* at 6709. In support, Dr. Arenella noted that plaintiff originally was found disabled due to his intestinal disorders and malnutrition but that a June 4, 2018 physical examination showed plaintiff weighed 158 pounds and was otherwise "normal except for abdominal hernia." *Id.* at 6712. Accordingly, Dr. Arenella believed plaintiff was capable of performing light work. *Id.* at 6713.

On September 6, 2018, plaintiff returned to Dr. Franco Cadavid. *Id.* at 6726. He weighed 165 pounds and reported "relief with wearing of abdominal binder." *Id.* In addition, plaintiff "denie[d] pain or fatigue with activity and [wa]s tolerating a regular diet with normal [bowel

movements].” *Id.* Dr. Franco Cadavid's notes from that visit also repeated her past observation that since 2017, plaintiff “ha[d] been steadily improving with improved nutritional and functional status.” *Id.*

On November 30, 2018, plaintiff returned to Dr. Franco Cadavid who commented that plaintiff's skin graft was “still not fully released from [his] underlying bowel . . . but [was] improving.” *Id.* at 6723–25.

On December 5, 2018, Ms. de La Rosa again treated plaintiff. *Id.* at 6718. She noted that plaintiff was walking for exercise and weighed 167 pounds. *Id.* at 6719–20. Plaintiff's diabetes remained “under inadequate control,” however, and Ms. de La Rosa modified his prescriptions in response. *Id.* at 6722.

On January 8, 2019, plaintiff appeared before an SSA disability hearing officer who was asked to reconsider the SSA's prior finding that plaintiff no longer was disabled. *Id.* at 117. Plaintiff weighed 160 pounds and described spending his “day[s] at home, walk[ing] 2 hours in the morning and 2 hours in the afternoon as directed by doctors” with breaks to “stop and rest at varying intervals.” *Id.* at 117–121. In addition, plaintiff stated he was able to lift or carry no more than twenty-five pounds and could only stand or walk for forty-five minutes at a time. *Id.* at 122.

On January 11, 2019, plaintiff again visited Ms. de La Rosa, who noted plaintiff's medical history was “significant for [ ] necrotizing pancreatitis with retroperitoneal abscess” and described his past hospital admissions “related to his pancreatitis.” *Id.* at 6754.

On February 22, 2019, the hearing officer rendered his decision. *Id.* at 129–135. In it, the hearing officer observed that plaintiff “ha[d] been steadily improving with improved nutritional and functional status.” *Id.* at 131. The hearing officer also concluded that plaintiff's “pancreatitis ha[d] resolved though [plaintiff] continue[d] to demonstrate a large hernia and incomplete skin

13

graft." *Id.* In sum, the hearing officer found that "there ha[d] been a decrease in the severity of [plaintiff]'s impairment" since the comparison point date of April 3, 2017. *Id.* at 133.

On July 16, 2019, Dr. Yasser Ousman examined plaintiff. *Id.* at 6820. Dr. Ousman repeated plaintiff's medical history for pancreatitis and recorded his weight at 178 pounds. *Id.* at 6820–26. Dr. Ousman also counseled plaintiff on the need to monitor his diabetes and adjust his eating habits accordingly. *Id.* at 6825–26.

On October 7, 2019, plaintiff was seen by Dr. Shwetha Thukuntla.[6] *Id.* at 6802. There, Dr. Thukuntla noted that plaintiff's medical history was "significant for necrotizing pancreatitis with retroperitoneal abscess." *Id.* at 6802. Dr. Thukuntla also recorded plaintiff's weight at 175 pounds and treated him by adjusting his medication regimen. *Id.* at 6809.

On November 25, 2019, plaintiff again visited Dr. Franco Cadavid to discuss potential surgery. *Id.* at 6763. Dr. Franco Cadavid noted that plaintiff was "well known to [her] with giant abdominal hernia following decompression for abdominal compartment syndrome with acute pancreatitis [J]an[uary] 2017." *Id.* She further opined that plaintiff needed "better control" of his diabetes but had "[n]o work restrictions though [she] doubt[ed] he [wa]s able to perform tasks requiring heavy lifting." *Id.* at 6767.

On January 28, 2020, Dr. Watras admitted plaintiff to the Inova Fairfax Hospital for treatment of a small bowel obstruction, generalized abdominal pain, and hyperglycemia. *Id.* at 6834. Plaintiff's only other "[p]roblem[]" "present on admission" was a ventral hernia. *Id.* at 6879. Upon admission to the hospital, Dr. Laura Diegelmann recorded that plaintiff had a "history of pancreatitis, alcohol abuse, small bowel obstruction, and diabetes mellitus" and had "present[ed]

---

[6] Plaintiff returned to Dr. Thukuntla on November 20 and December 18, 2019. *See* AR at 6786, 6769. The findings from those visits were largely consistent with those observed at plaintiff's October 7, 2019 appointment. Specifically, plaintiff weighed 165 pounds at the November appointment and 169 pounds at the December appointment. *See id.* at 6777, 6795.

with constant moderate cramping abdominal pain onset 9 hours prior to arrival after eating dinner, with associated nausea." *Id.* at 6836. Dr. Diegelmann further observed that plaintiff "appear[ed] . . . well-nourished" and weighed 170 pounds. *Id.* at 6836, 6895. Plaintiff was discharged two days later. *Id.* at 6878.

On January 30, 2020, Dr. Katherine Shelton authored a letter stating that plaintiff "continue[d] to have a large ventral hernia and [wa]s awaiting surgery for hernia repair." *Id.* at 6828.

## II.    Disability Evaluation Process

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the claimant must have a severe impairment that makes it impossible to do past relevant work or any other substantial gainful activity ("SGA") that exists in the national economy. *Id.*; *see also Heckler v. Campbell*, 461 U.S. 458, 460 (1983).  When determining whether a claimant who was previously found disabled continues to be disabled under applicable regulations, the ALJ is required to apply an eight-step sequential evaluation process for Title II claims and a seven-step sequential evaluation process for Title XVI claims. *See* 20 C.F.R. §§ 404.1594, 416.994. It is these processes the court examines to determine whether the correct legal standards—discussed below—were applied and whether the ALJ's decision is supported by substantial evidence in the record. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Hamed v. Saul*, Case No. 1:19-cv-00238-TSE-JFA, 2019 WL 8062701, at *6 (E.D. Va. Oct. 18, 2019), *report and recommendation adopted*, 432 F. Supp. 3d 610 (E.D. Va. 2020).

Specifically, in medical improvement cases, the ALJ considers the following sequential evaluation: (1) is the claimant currently performing substantial gainful activity; (2) does the claimant have an impairment or combination of impairments that meets or medically equals a listing; (3) has there been medical improvement since the initial disability determination; (4) if medical improvement has occurred, whether the improvement is related to claimant's ability to work; (5) if there is no medical improvement—or the improvement is not related to the claimant's ability to work—whether an exception to this step applies; (6) are the claimant's current impairments, in combination, "severe"; (7) if the claimant's impairments are "severe," what is the claimant's residual functional capacity and can the claimant perform past relevant work; (8) if the claimant cannot perform past relevant work, whether other work exists that the claimant can perform given his residual functional capacity, age, education, and past work experience. If a claimant can perform other work, he is no longer considered disabled; however, if a claimant cannot perform other work, his disability continues. 20 C.F.R. § 404.1594, § 416.994; *see also Hamed*, 2019 WL 8062701, at *6.

## A.    The ALJ's Decision

On March 25, 2020, the ALJ issued a decision finding plaintiff was no longer disabled from July 16, 2018 through the date of his decision. AR at 35. Under the first step of his eight-part inquiry, the ALJ found that April 3, 2017 marked the comparison point date, *i.e.* the date of the most recent favorable medical decision finding plaintiff disabled. *Id.* at 37. The ALJ further found that at the comparison point date, plaintiff suffered from malnutrition due to an intestinal disorder (pancreatitis), a severe medical impairment that resulted "in the residual functional capacity of sedentary work with no stooping and only occasional bending, balancing, kneeling, crouching, and crawling." *Id.* The ALJ also found that plaintiff had not engaged in substantial gainful activity

through the date of his decision and that, since July 16, 2018, plaintiff suffered from the following severe medically determinable impairments: ventral incisional hernia, skin grafts to abdomen, and diabetes. *Id.*

Under step two, the ALJ found that since July 16, 2018, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the SSA's official Listing of Impairments. *Id.* at 18. The ALJ considered listings 5.00 (digestive system), 9.00 (Endocrine System), and SSR 14-2p (diabetes mellitus) but found that plaintiff satisfied none singly or in combination with one another. *Id.* at 38.

Accordingly, at steps three and four, the ALJ concluded that "[m]edical improvement occurred on July 16, 2018 . . . to the point where [plaintiff] has had the residual functional capacity to perform light work with only occasional postural activities." *Id.*

The ALJ then skipped step five as inapplicable and, at step six, found that plaintiff suffered from the above-identified severe medically determinable impairments (ventral incisional hernia, skin grafts to abdomen, and diabetes). *Id.*

At step seven, the ALJ established plaintiff's RFC and determined plaintiff was able to "perform light work as defined in 20 CFR 404.1567(b) except that he c[ould] only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; c[ould] never climb ladders, ropes and scaffolds; and must avoid concentrated exposure to temperature extremes, wetness, excessive vibration, hazardous moving machinery and unprotected heights." *Id.* at 39. In support, the ALJ provided an overview of plaintiff's physical health records. *Id.* at 40–43. The ALJ at this point focused specifically on notations in plaintiff's records that "indicated the [plaintiff] ha[d] been steadily improving with improved nutritional and functional status," descriptions regarding his activities of daily life, and his "generally routine and conservative" treatment. *Id.* at 41–42.

At the same time, the ALJ considered all reported symptoms and the extent to which they were reasonably consistent with objective medical evidence and opinion evidence. *Id.* at 40. The ALJ applied a two-step process, considering first whether plaintiff's underlying impairments would be reasonably expected to produce plaintiff's symptoms, and second whether those impairments limited plaintiff's functioning. *Id.* The ALJ determined that, while plaintiff's impairments could be reasonably expected to cause plaintiff's alleged symptoms, plaintiff's statements about the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the objective medical evidence and other evidence" in the record. *Id.* at 42.

The ALJ gave no doctor's opinion controlling weight when reaching this conclusion. He did, however, find the opinions from Drs. Williams and Arenella deserved "substantial weight." *Id.* at 43. In contrast, he found that Dr. Franco Cadavid's opinion from November 25, 2019 warranted only "moderate weight" based on the fact that Dr. Franco Cadavid "doubt(ed) [plaintiff] [wa]s able to perform task(s) requiring heavy lifting" even though "the record as a whole, including the claimant's daily living activities and the two Physical Residual Functional Capacity evaluation reports, suggest[ed] that the [plaintiff] should be restricted to light lifting." *Id.*

The ALJ summarized his conclusions on these points by noting:

> In sum, the [plaintiff]'s incisional hernia is well-healed without distention or obstruction and his skin graft is improving. The [plaintiff]'s stomach pain is relieved with his abdominal binder. Since his cessation date, he has retained normal weight. Despite his abdominal impairments, the cla[i]mant reported he could lift 25 pounds. Despite his abdominal impairments and diabetes, he also walks 4 hours a day just for exercise. Thus, he can perform the lifting, standing, and walking associated with light work as found by the State agency physicians.

*Id.* at 43.

Under the final step, the ALJ found that, considering plaintiff's age, education, work experience, and RFC based on the impairments present on July 16, 2018, there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. *Id.* at 44.

### B.     Appeals Council Review

The Appeals Council denied plaintiff's request for review, finding no basis for review, and held the ALJ's decision to be the final decision of the Commissioner of Social Security. *Id.* at 1.

### III.     Standard of Review

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence in the record, and whether the proper legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 589. When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1996). "Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).  If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *see also Richardson*, 402 U.S. at 401.

Although the standard is high, when the ALJ's determination is not supported by substantial evidence on the record or when the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In evaluating whether the ALJ made an error of law, the Fourth Circuit applies a harmless error analysis in the context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The harmless error doctrine prevents remand when the ALJ's decision is "overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" and a remand would be "a waste of time." *Williams v. Berryhill*, Case No. 1:17-cv-00167, 2018 WL 851259, at *8 (E.D. Va. Jan. 18, 2018) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. App'x 65, 67 (4th Cir. 2014) (per curiam)). An ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant. *See Lee v. Colvin*, Case No. 2:16-cv-00061, 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016).

When reviewing a decision for harmless error, a court must look at "[a]n estimation of the likelihood that the result would have been different." *Morton-Thompson v. Colvin*, Case No. 3:14-cv-00179, 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) (citing *Shineski v. Sanders*, 556 U.S. 396, 411–12 (2009)).

## IV.    Analysis

Plaintiff moves for summary judgment based on five alleged errors in the ALJ's opinion, namely that the ALJ failed to: (1) support his decision with substantial evidence; (2) fully develop the record; (3) give appropriate weight to the medical opinions in the record; (4) develop an appropriate RFC for the plaintiff; and (5) present the VE with an appropriate hypothetical

question.[7] *See* Pl. Br. (Dkt. No. 17) at 6–19. Defendant responds that no such errors occurred. *See* Def. Br. (Dkt. No. 21) at 13–23.

For the reasons that follow, the Court agrees with defendant. Plaintiff's Motion for Summary Judgment will be denied, defendant's Motion for Summary Judgment will be granted, and the ALJ's decision will be affirmed.

### A.    Substantial Evidence

Plaintiff first argues that, because this is a continuing disability case, defendant had the burden of establishing plaintiff was not disabled yet failed to meet that requirement during the administrative proceedings. *See* Pl. Br. at 8. Specifically, plaintiff notes that he was "found disabled on April 3, 2017, based on Gastrointestinal System Disorder (Primary Diagnosis), Weight Loss (Secondary Diagnosis), and diabetes . . . ." *Id.* He continues that the ALJ failed to provide substantial evidence to support his findings (1) that plaintiff's condition improved with respect to those impairments, and (2) that such improvement related to plaintiff's ability to work. *Id.* The Court disagrees.

---

[7] The Court notes that throughout the administrative record plaintiff is seen relying on interpreters and/or his wife to communicate in English with medical care providers and engage in the disability adjudication process. Indeed, defendant represented to the Court that an interpreter was required in order for the parties to discuss a proposed briefing schedule in this matter. *See* Def. Br. at 11 n.6. Plaintiff's brief reflects no such difficulty with the English language. Rather, it bears a striking resemblance in substance and style to the memorandum that plaintiff's attorney, Orlando Barrios, submitted on behalf of his client when seeking Appeals Council review. *See* AR at 367–79. The only meaningful difference between the brief submitted below and the one submitted here is that plaintiff's brief in this matter contains additional points and citations to legal authority necessary for reframing the prior arguments to match the substantive and procedural requirements of this forum. As such, the Court cautions any "ghost-writer" of plaintiff's papers that "such a practice is strongly disapproved as unethical and as a deliberate evasion of the responsibilities imposed on attorneys" and that the act of "ghost-writing legal documents" "could serve as a basis for sanctions." *Davis v. Bacigalupi*, 711 F. Supp. 2d 609, 626 (E.D. Va. 2010); *see also Clarke v. United States*, 955 F.Supp. 593, 598 (E.D.Va.1997); *Laremont-Lopez v. Se. Tidewater Opportunity Ctr.*, 968 F.Supp. 1075, 1079–80 (E.D.Va.1997) ("[T]he practice of ghost-writing legal documents to be filed with the Court by litigants designated as proceeding *pro se* is inconsistent with the procedural, ethical and substantive rules of this Court."); *Chaplin v. DuPont Advance Fiber Sys.*, 303 F.Supp.2d 766, 773 (E.D.Va.2004) (quoting *Laremont-Lopez*, 968 F.Supp. at 1077, 1080) ("[T]his Court 'considers it improper for lawyers to draft or assist in drafting complaints or other documents submitted to the Court on behalf of litigants designated as *pro se*,'" and "the practice of ghost writing documents 'will not be tolerated in this Court.'").

Medical improvement is "any decrease in the medical severity of [a claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant] w[as] disabled or continued to be disabled." 20 CFR § 404.1594(b)(1). Any such determination "must be based on improvement in the symptoms, signs, and/or laboratory findings associated with [the claimant's] impairment(s)." *Id.* The ALJ determined that plaintiff experienced medial improvement on July 16, 2018. AR at 38 (citing 20 CFR § 404.1594(b)(1)). In support, he explained that plaintiff's "pancreatitis" had "resolved" since his last procedure to treat that condition in May 2017 and that plaintiff's condition had "improved to the extent that the [plaintiff] [wa]s capable of a wider range of functional activities" than he was before July 16, 2018. *Id.*

The issue, however, is that the ALJ cited to a disability hearing officer's report in concluding that plaintiff's pancreatitis had resolved. *See id.* (citing Ex. 7B/2–3). Plaintiff argues this constitutes reversible error because the cited exhibit does "*not* have clinical and/or laboratory findings showing plaintiff's medical condition (symptoms and signs) ha[d] decreased" in a manner related to his ability to work. *See* Pl. Br. at 9. Defendant, in turn, concedes that the "ALJ may have cited the wrong transcript pages in support of one of his statements" but continues that "there is no question that the medical evidence in [p]laintiff's record shows his pancreatitis resolved." Def. Br. at 14. The Court agrees with defendant. Any error in the ALJ's citation is harmless because the administrative record is replete with entries showing plaintiff's previously disabling medical conditions (namely his pancreatitis and malnutrition) improved in the months following his April 2017 release from the hospital.

The records from plaintiff's November 21, 2017 appointment with Dr. Watras particularly stand out in this regard because Dr. Watras referred to plaintiff's pancreatitis in the past tense at that appointment and later medical records show that plaintiff's pancreatitis was "[r]esolved" as

of that date. *See id.* at AR at 4887, 6833, 6986. Similarly, the May 18, 2018 records from Dr. Franco Cadavid show that, since 2017, plaintiff had "been steadily improving with improved nutritional status and functional status" and that plaintiff weighed 159 pounds while being "[n]egative for abdominal pain." *Id.* at 4849–50. The hearing officer erroneously cited to by the ALJ used this exact phraseology when finding the medical evidence on record showed that, since his last procedure in May of 2017,  plaintiff "ha[d] been steadily improving with improved nutritional and functional status." *Id.* at 131.

Accordingly, the Court finds that the ALJ satisfied the "relatively low threshold" required to show a decrease in the medical severity of plaintiff's impairments present as of April 3, 2017. *See Krystal H. v. Saul*, Case No. 4:19-cv-00005, 2020 WL 5526499, at *4 (W.D. Va. July 20, 2020), *report and recommendation adopted*, Case No. 4:19-cv-00005, 2020 WL 6047756 (W.D. Va. Oct. 13, 2020); *see also Robin F. on behalf of J.R.F. v. Berryhill*, Case No. 4:17-cv-00021, 2018 WL 10802683, at *7 (W.D. Va. Aug. 21, 2018) (citing 20 C.F.R. § 416.994a(c)) ("the decrease may be of any quantity or degree" so long as the determination is "based on changes (improvement) in the symptoms, signs, or laboratory findings associated with [the] impairment(s)" at issue). There is no question that, when comparing plaintiff's medical records from April 3, 2017 and the date of the ALJ's decision, the objective medical evidence, treatment notes, and plaintiff's own description of his impairments showed "improvement" in his condition. *See Latchum v. Astrue*, Case No. 4:07-cv-00042, 2008 WL 3978081, at *2–*3  (W.D. Va. Aug. 26, 2008); *Daniel C. v. Berryhill*, Case No. 5:17-cv-00074, 2018 WL 7051034, at *8 (W.D. Va. Dec. 28, 2018), *adopted by* 2019 WL 237400 (W.D. Va. Jan. 16, 2019). The Court, thus, rejects plaintiff's argument on this point.

###### B. Consultative Examinations

Plaintiff next challenges the ALJ's decision not to order a consultative examination despite counsel's request that he do so. Pl. Br. at 12. The issue first arose at the February 14, 2020 hearing, where the ALJ explained that he did not believe a consultative examination was necessary in light of the "upwards of 7,000 pages of medical records in this case," including "current records all the way up until" the hearing date. AR at 57. The ALJ reiterated that conclusion in his March 25, 2020 opinion where he wrote: "The undersigned has considered the claimant's request for consultative examinations . . . . This request is denied because the record is current, with medical treatment records through January 30, 2020." *Id.* at 35.

The Court identifies no error on this point. The law is clear that the decision of whether to order a consultative examination rested entirely within the discretion of the ALJ. *See Cooke v. Berryhill*, 767 F. App'x 539, 540 (4th Cir. 2019) (citing *Skinner v. Astrue*, 478 F.3d 836,844 (7th Cir. 2007) ("The ALJ is not *required* to order such [consultative] examinations, but may do so if an applicant's medical evidence about a claimed impairment is insufficient.") and *Sims v. Apfel*, 224 F.3d 380, 381–82 (5th Cir. 2000) ("whether to order a consultative examination lies within the ALJ's discretion")); 20 CFR § 404.1519a ("If we cannot get the information we need from your medical sources, we *may* decide to purchase a consultative examination . . . . We *may* purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination on your claim.") (emphases added). There is no abuse of that discretion when, after noting the record evidence is both voluminous and current, an ALJ relies on the medical opinions of non-examining state agency consultants rather than ordering a consultative examination. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citing *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971)) ("the testimony

of a non-examining physician can be relied upon when it is consistent with the record"). Accordingly, the Court will not disturb the ALJ's decision regarding plaintiff's denied request for a consultative examination.

### C.    Medical Opinions

Plaintiff's third point for appeal concerns the ALJ's treatment of the "reports and opinions of plaintiff's treating sources." Pl. Br. at 14. Plaintiff contends that the ALJ should have assigned "great weight" to the "medical opinions of Dr. Emond K[.] Ng, Dr. Christopher P. Michetti, Dr. Jill Watras, Dr. Elizabeth Franco [Cadavid], Dr. Shwetha Thukuntla and Dr. Yasser Ousman" because those "medical opinions" all were "based on personal examination of plaintiff, on a continuous basis, for a long period of time." *Id.*

This argument raises two separate issues. The first asks whether the ALJ failed to recognize Drs. Ng, Michetti, Watras, Thukuntla, and Ousman as having provided medical opinions regarding plaintiff's ability to work. *See* AR at 43 (discussing and weighing only the opinions of Drs. Williams, Arenella, and Franco Cadavid). The second examines the ALJ's basis for assigning "moderate weight" to Dr. Franco Cadavid's opinion. The Court addresses each issue in turn.

Medical opinions are "statements from acceptable medical sources that reflect *judgments* about the nature and severity of a claimant's impairment(s), including the claimant's symptoms, diagnosis, and prognosis, what the claimant can still do despite impairment(s), and the claimant's physical or mental restrictions." *Britt v. Saul*, 860 F. App'x 256, 260 (4th Cir. 2021) (quoting 20 CFR §§ 404.1527(a)(1), 414.927(a)(1)) (cleaned up; emphasis in original).

The question before the Court is whether the ALJ erred in implicitly finding that Drs. Ng, Michetti, Watras, Thukuntla, and Ousman did not provide medical opinions regarding plaintiff's alleged disability. If those doctors' records do contain medical opinions, the ALJ was required to

assign each medical opinion some form of persuasive weight. *See id.* (citing 20 CFR §§ 404.1527(c), 416.927(c)). But if those doctors did not provide any medical opinions, as that term is defined, the ALJ was required to undertake no such evaluation. *See id.* at 261 ("The agency must consider the entire record, but is only *required* to attribute weight to medical opinions in the record.") (emphasis in original).

Apart from Dr. Franco Cadavid, plaintiff identities in his brief no judgments from the above doctors regarding plaintiff's "physical or mental restrictions" or what he "still can do" despite his impairments. *See Britt*, 860 F. App'x at 260. And the Court, following a thorough review of the administrative record, finds none on its own. All that the record contains with respect to those doctors is exactly what plaintiff cites to: 6,663 pages of medical records and/or medical "findings" that overwhelmingly predate July 16, 2018 and do not constitute medical opinions.[8] *See* Pl. Br. at 14–15 (citing AR 385–7048). As such, the Court finds that the ALJ did not fail to consider any medical opinions in his decision.

As for the one doctor identified by plaintiff who did provide a medical opinion, the ALJ assigned that opinion "moderate weight" because it "assigned no work restrictions" whereas the ALJ believed the record showed that plaintiff "should be restricted to light lifting." AR at 43. The ALJ explained his reason for disagreeing with Dr. Franco Cadavid's *less* restrictive medical opinion by noting that although Dr. Franco Cadavid's opinion was consistent with her examination of plaintiff from that day, "the record as a whole, including [plaintiff]'s daily living activities and

---

[8] The Court does note that as part of her April 17, 2017 discharge notes, Dr. Catherine S. Denkler stated that plaintiff should avoid "heavy lifting or strenuous activity until cleared by [a] surgeon" and that on January 12, 2018, Dr. Ng wrote that plaintiff should "avoid heavy lifting." *See* AR at 4863, 6390. To the extent either notation could constitute a medical opinion, each predated plaintiff's cessation date and is accounted for by the ALJ's decision to restrict plaintiff to light lifting.

the two Physical Residual Functional Capacity Evaluation reports, suggest[ed] that [plaintiff] should be restricted to light lifting." *Id.*

The only possible error that plaintiff identifies with that reasoning is his suggestion that the ALJ "improperly substitute[ed] his opinion for that of the medical expert[]," namely, Dr. Franco Cadavid, when determining plaintiff was capable only of light lifting. *See* Pl. Br. at 15. The Court identifies no such error. Federal Regulations task the ALJ with making that very type of judgment. *See* 20 CFR § 404.1546(c). Moreover, even assuming that the ALJ erred on that specific point (which he did not), plaintiff is unable to show resulting harm because the ALJ adopted *more* restrictions in plaintiff's ability to lift than were contemplated by Dr. Franco Cadavid. *See Lee*, 2016 WL 7404722, at *8 (applying harmless error review).

Finally, the Court believes that plaintiff also may take issue with the fact that the ALJ credited the opinions "from the non-treating, non-examining" state agency consultants based on the fact that neither doctor ever "examined or treated plaintiff." Pl. Br. at 14. As discussed, *supra*, the mere fact of non-examination or non-treatment by an opining medical source does not render that source's opinion unworthy of persuasive weight. *See Gordon*, 725 F.2d at 235 (citing *Kyle*, 449 F.2d at 492). The Court, therefore, must reject all of plaintiff's arguments with respect to the ALJ's treatment of the medical opinions offered in this case.

**D.     The ALJ's RFC**

Plaintiff's fourth assignment of error relates to the ALJ's RFC determination. *See* Pl. Br. at 15. Specifically, plaintiff argues that the ALJ "failed to provide a specific and appropriate rationale for not considering" plaintiff's abdominal pain, hyperglycemia, reported vision problems, stated inability to lift more than ten pounds, and stated need to frequently use the restroom for long periods of time. *Id.* at 17–18. The ALJ, however, explicitly considered each such

condition in his decision but found that plaintiff's abdominal pain and inability to control his blood sugar "did not cause more than a minimal limitation of physical or mental ability to do basic work activities" and that the record did not entirely support plaintiff's statements regarding the "location, duration, frequency and intensity of his symptoms," including those related to his bowel movements. AR at 39–42.

Thus, as other courts have noted, plaintiff's argument "essentially boils down to the contention that the ALJ incorrectly weighed the evidence before him and failed to accept [p]laintiff's testimony." *Robinson v. Colvin*, Case No. 2:12-cv-00058, 2014 WL 347401, at *14 (E.D.N.C. Jan. 30, 2014). The Court cannot accept that argument. For "[a]lthough [p]laintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary." *Id.* Because plaintiff essentially asks the Court to do just that through his challenge to the ALJ's RFC determination, plaintiff's argument lacks merit. *See id.* There is no error—reversible or otherwise—where the ALJ applied the correct legal standard in establishing an RFC and substantial evidence supported the resulting RFC determination. *Id.*

### E.     The VE Hypothetical

Plaintiff's final challenge to the ALJ's decision is that the hypothetical question posed to the VE purportedly "fail[ed] to include all of plaintiff's exertional and non-exertional limitations." Pl. Br. at 18. To accept plaintiff's argument, however, requires this Court to find that the ALJ erred in establishing plaintiff's RFC. *See Koonce v. Apfel*, 166 F.3d 1209, 1999 WL 7864, at *5 (4th Cir. 1999) (finding ALJ "ha[d] great latitude in posing hypothetical questions and [wa]s free to accept or reject suggested restrictions so long as there [wa]s substantial evidence to support the ultimate

conclusion"). That is because the hypothetical posed to the VE aligned with the ALJ's RFC determination. *Compare* AR at 73 (VE hypothetical) *with* AR at 39 (RFC determination).

For the reasons stated above, the Court finds no error in the ALJ's RFC determination. Accordingly, it can find no error with respect to the corresponding hypothetical question posed to the VE. *See Thompson v. Colvin*, Case No. 7:13-cv-00491, 2015 WL 5690878, at *6 (W.D. Va. Sept. 28, 2015) (rejecting argument "posit[ing] that the hypothetical, which was premised on the RFC assessment, was deficient because" the Court found no deficiency in the ALJ's RFC assessment); *Robinson*, 2014 WL 347401, at *15 (finding no error where "the hypothetical question posed to the VE by the ALJ was based on a RFC determination supported by substantial evidence and therefore accurately reflected all of Plaintiff's limitations"); *Yuengal v. Astrue*, CaseNo. 4:07-cv-00033, 2008 WL 591080, at *13 (E.D.N.C. Mar. 3, 2008) (same). Plaintiff's argument on this point must be rejected.

*     *     *

Accordingly, it is hereby ORDERED that plaintiff's Motion for Summary Judgment (Dkt. No. 16) is DENIED; and it is further

ORDERED that defendant's Motion for Summary Judgment (Dkt. No. 19) is GRANTED and the Administrative Law Judge's decision is AFFIRMED.

The Clerk is directed to enter judgment in favor of defendant in accordance with Rule 58 of the Federal Rules of Civil Procedure.

It is SO ORDERED.

/s/
Michael S. Nachmanoff
United States District Judge

August 12, 2022
Alexandria, Virginia